IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Tamara L. Kise, :

    Plaintiff, :

  v. : Case No. 2:16-cv-0396

Commissioner of Social Security,: JUDGE JAMES L. GRAHAM
                                     Magistrate Judge Kemp
    Defendant. :

REPORT AND RECOMMENDATION

I.  Introduction

    Plaintiff, Tamara L. Kise, filed this action seeking review of a decision of the Commissioner of Social Security denying her applications for disability insurance benefits and supplemental security income.  Those applications were filed on March 6, 2012, and alleged that Plaintiff became disabled on February 5, 2010.

    After initial administrative denials of her claim, Plaintiff was given a hearing before an Administrative Law Judge on October 17, 2013, and a supplemental hearing on March 20, 2014.  In a decision dated November 10, 2014, the ALJ denied benefits.  That became the Commissioner's final decision on March 10, 2016, when the Appeals Council denied review.

    After Plaintiff filed this case, the Commissioner filed the administrative record on July 11, 2016.  Plaintiff filed a statement of specific errors on September 23, 2016.  The Commissioner responded on December 6, 2016.  Plaintiff filed a reply brief and amended reply brief on December 20, 2016, and the case is now ready to decide.

II.  Plaintiff's Testimony at the Administrative Hearings

    Plaintiff, who was 42 years old as of the date of the first administrative hearing and who has a high school education with some college work, testified as follows.  Her testimony appears

at pages 56-74 of the administrative record.  She testified only
at the first administrative hearing.

When asked about her living situation, Plaintiff testified
that she had been homeless for the past year.  Before that, she
lived with her parents.  She said that she had pain in her right
hip and that she could stand or walk for about half an hour and
sit for the same amount of time.  She could not do either
activity for more than two hours in an eight-hour workday and
could lift only ten pounds, and even that was painful.

Plaintiff's last job was as a file clerk with Ohio Insurance
Liquidators.  She spent the majority of her day standing and
walking, and had to lift up to fifteen pounds.  She had also
worked as a customer service representative for various
employers.  That was a seated position which did not allow breaks
at will.

Next, Plaintiff testified that she had been seeing a mental
health counselor since 2007.  However, there was a treatment gap
from 2009 to 2012, when she resumed counseling due to deaths in
her family.  Plaintiff also said that she spent most days in the
library.  She did need to lie down during the day due to pain.
Additionally, she had been hearing voices since 2010.

### III. The Medical Records

The pertinent medical records are found beginning at page
319 of the record.  The more significant ones - those created
close to or after Plaintiff's alleged onset date - can be
summarized as follows. It is helpful to note that prior to that
date (February 5, 2010), Plaintiff had been diagnosed with and
treated for (among other conditions) bipolar disorder,
posttraumatic stress disorder, panic, anxiety, sleep issues,
hypertension, and knee pain.

### A. Physical Impairments

Plaintiff sought treatment at the Mt. Carmel Hospital

emergency room on May 27, 2011, complaining of increasing pain in her back.  She related it to a fall which had happened several months before.  She also had a broken toe.  She was treated, given medication, and directed to follow up with a physician. (Tr. 441-49).

On April 23, 2012, Dr. Whitehead performed a consultative physical examination.  Plaintiff's chief complaints at that time were low back pain and left knee pain.  She reported limits on her ability to lift, sit, and walk, and said that her most comfortable position was lying down.  Plaintiff walked with a slightly antalgic gait and had restricted range of motion in her lumbar spine.  Straight leg raising was negative.  Dr. Whitehead diagnosed left knee pain and chronic low back pain without active radiculopathy.  He said that Plaintiff could do sedentary work as long as she could sit and stand as needed for comfort.  (Tr. 451-58).

Plaintiff underwent another orthopedic evaluation on December 2, 2013.  The examiner, Dr. Brown, noted that Plaintiff said that her problems were primarily psychological in nature but she did have back pain as well.  She also reported left knee pain and right hip pain.  Her gait was normal.  Plaintiff exhibited tenderness in the cervical spine, the left knee, and over the entire thoracolumbar spine, most pronounced at L4-5.  She was assessed with left knee pain and chronic back and neck pain.  Dr. Brown thought Plaintiff could perform moderate duty work and was only mildly impaired by the findings noted at the examination. (Tr. 564-79).

The records were reviewed by two state agency physicians. Dr. Das thought that Plaintiff could perform light work with some postural restrictions.  (Tr. 104-06).  Dr. Bertani concurred with that assessment.  (Tr. 136-37).

### B. Mental Impairments

-3-

Dr. Donaldson, a psychologist, performed a consultative psychological evaluation on April 26, 2012. Plaintiff told Dr. Donaldson that she was not mentally able to function due to anxiety and panic attacks. She had previously been treated for depression. Plaintiff's affect was flat and her mood was depressed with anxious features. She reported mood swings and manic behavior as well as continual anxiety. Dr. Donaldson diagnosed bereavement, generalized anxiety disorder, panic disorder, and bipolar disorder. He rated Plaintiff's GAF at 45 and thought her prognosis was guarded. He concluded that she had no limits on her ability to understand, remember, and carry out instructions; that she was limited in her ability to maintain concentration, persistence, and pace; that she was also limited in her ability to relate to others in the workplace; and that her symptoms might precipitate workplace disruptions. (Tr. 459-65). Subsequently, Ann Peden, a nurse who participated in Plaintiff's psychological care, completed a form indicating that Plaintiff had many extreme psychological limitations. (Tr. 561-63).

There are a number of treatment notes after that date from Lower Lights Christian Health Center showing that Plaintiff was being treated for psychotic symptoms including hearing voices and visual hallucinations. Her diagnoses included a severe bipolar disorder and a psychotic affective disorder, and her GAF was generally rated in the 43-48 range. She was taking a number of medications including Abilify and Seroquel. Both Ms. Peden and others who provided counseling or treatment to Plaintiff completed forms in 2015 indicating, as did the prior form, that Plaintiff had a plethora of extreme mental limitations. (Tr. 753-61). One of the treaters, Rosanne Hickman, also wrote a letter dated December 3, 2014, which was signed by a Dr. Stamps as well, stating that Plaintiff was severely mentally ill and needed disability benefits in order to survive. (Tr. 763-65).

State agency psychologists also expressed opinions about Plaintiff's mental residual functional capacity. On May 21, 2012, Dr. Hill concluded that Plaintiff could work in a static work environment where changes were explained and gradually introduced, where interactions with others were limited, with no conflict resolution or persuading others, and where she would be limited to the performance of one- to four-step tasks with no multi-tasking and no requirement for rapid task completion. (Tr. 106-07). On October 26, 2012, Dr. Richardson reached the same conclusions. (Tr. 138-39). Neither had the benefit of the subsequent treatment notes and opinions from Lower Lights.

IV. <u>The Vocational Testimony</u>

Vocational experts testified at both administrative hearings. The Court will summarize only the testimony of Dr. Richard Oestreich, who testified at the second hearing, and whose testimony begins at page 36 of the administrative record.

Dr. Oestreich was first asked about Plaintiff's past work. He said that she had held three different types of jobs, those being telephone information clerk, file clerk, and administrative assistant. All of those jobs were sedentary; the first two are semi-skilled positions, and the third is skilled. She had acquired job skills which would transfer to other positions like receptionist.

Dr. Oestreich was next asked questions about a hypothetical person with Plaintiff's age, education, and experience who could do a limited range of light work. The person could climb stairs occasionally as well as kneel, crouch, and crawl, could frequently balance and stoop, and could not climb ladders, ropes, or scaffolds. He said that someone with those restrictions could do all of Plaintiff's past relevant work and work based on transferable skills, as well as about 50% of the unskilled light jobs available. Were the person limited to sedentary work, he or

she could still do all of Plaintiff's past jobs.

Next, a hypothetical question was posed which included some psychological restrictions. It described a person who was limited to the performance of simple routine tasks, who could interact with others on an occasional basis, and who could do only low-stress work without strict production quotas or time pressures. Dr. Oestreich testified that those limitations would preclude the performance of Plaintiff's past work, but the person could do 50% of the unskilled sedentary jobs available, including addresser and document preparer.

The next hypothetical asked Dr. Oestreich to assume that someone was physically limited as described in the form completed by Dr. Brown, the consultative examiner, and who still had the same psychological limitations previously indicated. He said that the physical limitations still allowed a fair percentage of light jobs to be performed, and he identified occupations like packager, sorter, and inspector.

Dr. Oestreich was then questioned by Plaintiff's counsel. He said, first, that someone who needed to sit or stand as needed for comfort could still do the sedentary jobs he had identified. Next, if the person were off task for more than 10% of the day, that would be work-preclusive. Also, someone with extreme limitations on numerous mental activities needed for work could not be employed.

### V. The Administrative Law Judge's Decision

The Administrative Law Judge's decision appears at pages 11-25 of the administrative record. The important findings in that decision are as follows.

The Administrative Law Judge found, first, that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2015. Second, she found that Plaintiff had not engaged in substantial gainful activity since her alleged onset

date.  Going to the next step of the sequential evaluation
process, the ALJ concluded that Plaintiff had severe physical
impairments including degenerative disc disease at level L4-5 and
L5-S1; hypertension; left knee pain with remote anterior cruciate
ligament tear and possible degenerative changes; obesity;
bereavement disorder; generalized anxiety disorder; panic
disorder; and bipolar disorder.  The ALJ also found that these
impairments did not, at any time, meet or equal the requirements
of any section of the Listing of Impairments (20 C.F.R. Part 404,
Subpart P, Appendix 1).

Moving to the next step of the sequential evaluation
process, the ALJ found that Plaintiff could lift up to 50 pounds
occasionally and 20 pounds frequently, could sit for two hours at
a time up to eight hours in a workday, could walk for an hour at
a time and up to three hours in a workday, and could stand for
one hour at a time for up to two hours in a workday.  Also, she
could occasionally bend, stoop, crawl, and squat, could use her
arms frequently for pushing and pulling and could use her legs
and feet frequently for the operation of foot controls.  She had
to avoid work at unprotected heights and could work around moving
machinery only occasionally.  Lastly, she could perform simple,
routine tasks in a low stress environment, defined as requiring
only occasional interaction with others and work with no strict
production quotas or time pressures.

With these restrictions, the ALJ concluded that Plaintiff
could not perform any of her past relevant work.  However,
relying on the vocational testimony, the ALJ found that Plaintiff
could do 40% of the light unskilled jobs including packager,
sorter, and inspector.  The ALJ also found that such jobs existed
in significant numbers in local economy and the State economy.
That finding is inconsistent with a determination of disability.
Consequently, the ALJ decided that Plaintiff was not entitled to

benefits.

VI. Plaintiff's Statement of Specific Errors

In her statement of errors, Plaintiff raises these issues: (1) the ALJ's mental residual functional capacity finding is not supported by substantial evidence; and (2) the ALJ failed to follow Social Security Ruling 06-03p when evaluating the medical opinion evidence. A third issue, asking for a sentence six remand, has been withdrawn. These issues are evaluated under the following legal standard.

Standard of Review. Under the provisions of 42 U.S.C. Section 405(g), "[t]he findings of the Secretary [now the Commissioner] as to any fact, if supported by substantial evidence, shall be conclusive. . . ." Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Company v. NLRB, 305 U.S. 197, 229 (1938)). It is "'more than a mere scintilla.'" Id. LeMaster v. Weinberger, 533 F.2d 337, 339 (6th Cir. 1976). The Commissioner's findings of fact must be based upon the record as a whole. Harris v. Heckler, 756 F.2d 431, 435 (6th Cir. 1985); Houston v. Secretary, 736 F.2d 365, 366 (6th Cir. 1984); Fraley v. Secretary, 733 F.2d 437, 439-440 (6th Cir. 1984). In determining whether the Commissioner's decision is supported by substantial evidence, the Court must "'take into account whatever in the record fairly detracts from its weight.'" Beavers v. Secretary of Health, Education and Welfare, 577 F.2d 383, 387 (6th Cir. 1978) (quoting Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951)); Wages v. Secretary of Health and Human Services, 755 F.2d 495, 497 (6th Cir. 1985). Even if this Court would reach contrary conclusions of fact, the Commissioner's decision must be affirmed so long as that determination is supported by substantial evidence. Kinsella v. Schweiker, 708

F.2d 1058, 1059 (6th Cir. 1983).

                A.  <u>Mental Residual Functional Capacity</u>

Plaintiff's first statement of error focuses on the consultative evaluation done by Dr. Donaldson. She notes that Dr. Donaldson expressed the view that she would have difficulty with many workplace requirements, and also that the ALJ purported to give great weight to Dr. Donaldson's evaluation. However, she argues that there are significant inconsistencies between Dr. Donaldson's evaluation and the ALJ's mental residual functional capacity finding and that, as a result, the ALJ's finding is not supported by substantial evidence. Plaintiff also faults the ALJ for disregarding Dr. Donaldson's statement that pain would exacerbate her mental difficulties, that she would need assistance managing benefits, and that her GAF score was 45. All of these, she claims, demonstrate that the ALJ improperly rejected, rather than accepted, Dr. Donaldson's opinions. The Commissioner responds that the ALJ's residual functional capacity finding was sufficiently consistent with Dr. Donaldson's opinions, as well as those of the state agency reviewers, to undercut Plaintiff's argument, and that the ALJ did not err by failing to discuss certain statements in his opinion or by choosing not to place significant reliance on the GAF score. In her reply, Plaintiff makes her argument more specifically, asserting that the ALJ simply failed to account for certain limitations contained in Dr. Donaldson's report, including a limitation to the performance of simple tasks and the fact that chronic pain and fatigue would affect Plaintiff's ability to concentrate in the workplace.

Here is what the ALJ said about Dr. Donaldson' report. Before discussing it, the ALJ gave "great weight" to the two state agency psychologists' reports because those psychologists had "knowledge of the Social Security Administration's program and requirements" and because their opinions were "consistent

with the medical evidence of record." (Tr. 21). She then noted that the mental limitations incorporated into the residual functional capacity finding "generally accept and adopt the opinion of Dr. Donaldson," which she also gave great weight due to his familiarity with the Social Security program and the fact that his opinion was based on his own observations, psychometric testing, and his interview with Plaintiff. Id.

The ALJ did not, however, accept every finding made by Dr. Donaldson. For example, she rejected his GAF score of 45 as "not consistent with the narrative of his evaluation." (Tr. 22). She also rejected the usefulness of those scores more generally, in part because they represent a snapshot of a claimant's functioning rather than a longitudinal evaluation and because the score is subjective and based on the claimant's own description of limitations. (Tr. 22-23). As Plaintiff has pointed out, the ALJ did not otherwise discuss the specifics of Dr. Donaldson's opinion.

The most significant area where, according to Plaintiff, the ALJ's residual functional capacity finding and Dr. Donaldson's report diverge relates to Plaintiff's ability to perform simple tasks. The ALJ found Plaintiff could perform them; Dr. Donaldson said that her ability to do so "may be limited by symptoms of anxiety, bipolar, bereavement and panic disorders" and might also be affected by her pain and fatigue. (Tr. 464). He did not, however, say that she could not carry out simple (or even multi-step) tasks, nor did he suggest any workplace accommodations which might reduce or eliminate the difficulties he identified. According to Plaintiff, the ALJ's failure explicitly to acknowledge that Dr. Donaldson had identified these limitations, when coupled with the ALJ's decision to give great weight to Dr. Donaldson's report, requires the Court to remand the case so that the ALJ can more fully explain her reasoning.

In the Court's view, Plaintiff is demanding a level of

specificity from the ALJ that the law does not require. There is no particular articulation requirement which applies to opinions from non-treating sources, even when all or some portion of those opinions is rejected. See, e.g., Dykes ex rel. Brymer v. Barnhart, 112 Fed. Appx. 463, 468 (6th Cir. Oct. 12, 2004)(""the ALJ's failure...to explain why he disregarded part of the opinion of a consultative examiner does not warrant reversal"). Where there is some minor discrepancy between, for example, the opinion of a consultative examiner and that of a state agency physician, the ALJ is entitled to resolve that discrepancy based on the substantial evidence of record, and need not give a detailed explanation of that resolution. See Pierce v. Comm'r of Social Security, 2015 WL 6561950 (S.D. Ohio Oct. 30, 2015), adopted and affirmed 2015 WL 7888791 (S.D. Ohio Dec. 4, 2015).

That is what happened here. It could be argued, as the Commissioner has asserted, that there is actually no discrepancy at all among the three opinions to which the ALJ assigned great weight; Dr. Donaldson said that Plaintiff would have some unspecified problems dealing with simple tasks, and the state agency reviewers concluded that she could perform those tasks in a static work environment with no multi-tasking and no requirement for rapid task completion. Those findings are not necessarily inconsistent. Even if they are, the ALJ was entitled to accept the state agency reviewers' interpretation of Dr. Donaldson' report, which they had before them, to the extent that the two differ. Plaintiff has presented no argument that the ALJ was not permitted to rely on those reports to the extent that they differ from Dr. Donaldson's assessment. Consequently, the Court finds nothing in the ALJ's evaluation of the expert reports which would necessitate a remand.

### B. SSR 06-03p

Plaintiff's other argument is that the ALJ's evaluation of the report of Ms. Peden, who is not, under the applicable

regulation, an "acceptable medical source."  The ALJ gave weight to this report only to the extent that it supported the existence of "some mental limitations," Tr. 22, but rejected the extreme limitations indicated in the report.  Plaintiff argues that the ALJ failed explicitly to recognize (even though she cited to SSR 06-3p, see Tr. 17) that it was possible to give the greatest weight to Ms. Peden's opinion, something she characterizes as a "procedural deficiency."  See Doc. 11, at 12.  She then asserts that the ALJ failed to take the longitudinal treating relationship into account when weighing Ms. Peden's evaluation, and, in fact, erroneously stated that Ms. Peden had treated Plaintiff for a short period of time when that was not the case.  The Commissioner concedes this latter point, acknowledging that the treatment relationship began as early as November, 2012, see Doc. 14, at 13, but contends that the ALJ's "analysis of the opinion was otherwise entirely reasonable."  Id. at 15.  In particular, the Commissioner argues that the ALJ properly made her decision to discount Ms. Peden's opinions because none of the treatment notes supported such extreme limitations and because the basis of those limitations appeared to be Plaintiff's own self-reported symptoms.

As the Commissioner notes, the ALJ's decision contains a significant amount of analysis about the mental health treatment notes.  The earliest set of notes indicates that Plaintiff was discharged from further treatment after her goals were met.  There was then a gap of almost three years without mental health treatment.  When she resumed treatment, another year passed before she began reporting psychotic symptoms, and there was never any crisis intervention done.  With this background, the ALJ then began her analysis of Ms. Peden's opinions.

Despite Plaintiff's argument to the contrary, the ALJ's opinion does not suffer from any procedural deficiencies in terms of the ALJ's application of SSR 06-03p.  As this Court has

previously stated,

> SSR 06-3p states that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning...." This does not create an independent regulatory duty to articulate the ALJ's reasoning in the same way required for an opinion rendered by a treating source. See, e.g., Robinson v. Comm'r of Social Security, 2012 WL 194966, *12 (N.D. Ohio Jan. 20, 2012) ("there is no controlling precedent requiring an ALJ to explicitly address written statements such as" a function report from a case manager). Rather, all that is needed is a sufficient discussion of all of the evidence of record to demonstrate that the ALJ considered the key factors of " 'supportability and consistency' " in deciding how much to credit these types of reports. See Acton v. Comm'r of Social Security, 2013 WL 3761126, *5 (S.D. Ohio July 16, 2013), quoting Kerlin v. Astrue, 2010 WL 3937423, *8 (S.D. Ohio March 25, 2010), adopted and affirmed 2010 WL 3895175 (S.D. Ohio Sept. 29, 2010).

Swartz v. Comm'r of Social Security, 2014 WL 868127, *8 (S.D. Ohio March 5, 2014), adopted and affirmed 2014 WL 1343094 (S.D. Ohio Apr. 3, 2014). The ALJ did enough to satisfy these procedural requirements, so the issue comes down to whether the ALJ's reasoning process is supported by the evidence of record.

For the following reasons, the Court finds that it is. The ALJ first commented that the Lower Lights notes which preceded the first opinion rendered by Ms. Peden "do not support such extreme limitations." (Tr. 22). That is a fair reading of those notes. They do not themselves contain any indication of symptoms so extreme that, for example, Plaintiff could never deal with others in the work setting, could never maintain socially acceptable behavior, could never process information, could never maintain attention and concentration for even brief periods of time, could never be aware of hazards and take necessary precautions, and could never behave in an emotionally stable

-13-

manner. None of that was apparent when she was evaluated by Dr. Donaldson. She consistently, as the ALJ noted, presented with an appropriate mood and affect. She responded positively to medication and found ways to cope with her issues with hearing voices and avoiding arguments with people. She was medication-compliant. Various notes showed that she was not exhibiting psychotic symptoms. A reasonable person could infer from this body of evidence that Ms. Peden's opinions were disproportionate to the behaviors reflected in the treatment notes.

An ALJ always has a "zone of choice" in reaching conclusions from the record, so long as those conclusions are reasonable, even if the Court might, on *de novo* review, see the issue differently. See, e.g., Buxton v. Halter, 246 F.3d 762, 773 (6th Cir. 2001)("there is a 'zone of choice' within which the Commissioner can act, without the fear of court interference"). Here, the ALJ operated within that zone. The factors of consistency and supportability are appropriate factors to be considered under SSR 06-3p, and the ALJ both had, and expressed, valid reasons for concluding that those factors did not justify giving more than some weight to Ms. Peden's opinions. It is also helpful to note that the state agency reviewers, who had the opportunity to do some longitudinal review of the record, reached very different conclusions, as did Dr. Donaldson. Under these circumstances, the Court finds no error in the ALJ's decision to reject the extreme limitations posited by Ms. Peden and to give more weight to the opinions of the three psychologists who reached a different conclusion as to Plaintiff's mental limitations. That being so, there is no basis for remanding the case for additional proceedings.

## VII. Recommended Decision

Based on the above discussion, it is recommended that the Plaintiff's statement of errors be overruled and that judgment be entered in favor of the Commissioner.

## VIII. Procedure on Objections

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. Walters, 638 F.2d 947 (6th Cir. 1981).

/s/ Terence P. Kemp
United States Magistrate Judge